## Case No. 9,469.

### MERRILL v. DAWSON et al.

[Hempst. 563.] [1]

Circuit Court, D. Arkansas. Oct. 12, 1846.[2]

Deposition — Notice to Take — By Whom Taken — Ex Parte — Courts — Judicial Notice of Laws — Mortgages — Chattel — Record — Notice of Lien — Bill of Sale — Foreclosure.

1. Where the name of a defendant is omitted in the caption of a deposition, but appears in the commission and proceedings, such deposition should not be excluded.

2. Notice to take depositions is sufficient, if served by delivering a copy to the party, or leaving such copy at his dwelling-house or usual place of abode with a free white person, a member of, or resident in the family.

3. If a witness resides more than one hundred miles from the place of trial, his deposition may be taken under the 30th section of the judicial act of 1789 (1 Stat. 88) without notice. But the requisites of that act must be observed strictly.

4. The residence of the witness and distance from the place of trial, are facts proper for the inquiry of the officer taking the deposition, and his certificate of those facts is competent evidence and sufficient to authorize the deposition to be read.

[See Banks v. Miller, Case No. 963.]

5. The probate court of Mississippi being a court of record, and possessing a seal, the judge thereof is the judge of a county court, within the meaning of the above act, and as such, authorized to take a deposition under it.

6. Notice of the time and place of taking depositions is necessary under a joint commission; but when the opposite party, after notice, fails or refuses to join, and the commission issues ex parte, notice is not necessary.

7. On an ex parte commission, the party suing it out. is at liberty to put as few of the interrogatories as he thinks proper; except that he must put the last general interrogatory.

8. The courts of the United States will judicially take notice of the laws of the several states in the same manner as of the laws of the United States.

9. Until the act of the 20th February. 1838 (Rev. St. p. 578). and which took effect on the 19th March, 1839, there was no law requiring mortgages of personal property to be recorded; yet mortgagees. before that time, under laws in force. were permitted to have such mortgages recorded if they deemed it expedient.

10. Such recording was legal, but not per se operating as constructive notice to creditors and purchasers, although it tended to give publicity to the mortgage as well as repel fraud.

11. The statute of frauds (Ter. Dig. 266) cited and explained.

12. Notice of a lien or incumbrance on property, binds the purchaser when received before the actual payment of the purchase-money, and arrests all further steps towards the completion of the purchase, and if persisted in, is held to be in fraud of the equitable incumbrance.

13. A purchaser, to be protected, must deny notice before the actual payment of the purchase-money. and this essential averment cannot be supplied by intendment.

14. Where the existence of a mortgage was known and talked of in a neighborhood, and publicly proclaimed at a sale of such mortgaged property. under execution against the mortgagor; *held*, to be sufficient actual notice to purchasers at the sale, to hold them responsible.

15. Actual notice proved by facts and circumstances.

16. A bill of sale absolute on its face, and the vendor still retaining the possession of the property sold. has been held to be per se fraudulent as to creditors and subsequent purchasers of the vendor; such possession being inconsistent with the deed.

[Cited in Hempstead v. Johnston, 18 Ark. 123.]

17. Possession of slaves by the mortgagor, either before or after forfeiture, is neither fraudulent. nor a badge of fraud requiring explanation: such possession being consistent with the deed.

18. Declarations by a grantor impeaching a deed he has made, are incompetent evidence.

19. The practice in mortgage cases is by interlocutory decree to allow until the next term to redeem; and if the debt is not then paid or tendered. by final decree, to foreclose and bar the equity of redemption, and direct a sale if proper to be had.

20. An absolute foreclosure, in many cases. may be decreed without sale. It is a matter of sound discretion.

[This was a bill in equity by Ayres P. Merrill against James L. Dawson, William Dawson, James Smith, Samuel C. Roane, Samuel Taylor, Nathaniel H. Fish, Garland Hardwick, Absalom Fowler, Noah H. Badgett and Sophia M. Baylor, to foreclose a mortgage of certain negroes executed to secure the plaintiff.]

S. H. Hempstead, for complainant.

I. It is too well established at this day to be controverted, that a mortgage is a chattel interest. The object of the transaction in its original construction, is to create a security and that only. The mortgagor is equitably the sole owner until foreclosure, and has an estate of inheritance which may be devised, granted, or sold. 1 Atk. 603; 12 Ves. 334; 2 Ball & B. 402. The property in equity is regarded as only charged by the mortgage, and in no way passed, modified, altered, or affected, and the mortgagee, after foreclosure, acquires a new estate. 1 Pow. Mortg. 112a; Radcliffe v. Warrington, 12 Ves. 334; 4 Kent, Comm. 135, 142, 159; 1 Hil. Abr. 276; Clark v. Beach, 6 Conn. 142; Wilson v. Troup, 7 Johns. Ch. 38; 1 Schoales & L. 380; 1 Pow.

---

[1] [Reported by Samuel H. Hempstead, Esq.]
[2] [Affirmed in 11 How (52 U. S.) 375.]

Mortg. 187b, 188a, and note P; Bogart v. Perry, 1 Johns. Ch. 55; Doug. 630–632; Jackson v. Willard, 4 Johns. 42; Jackson v. Bronson, 19 Johns. 325; Runyan v. Mersereau, 11 Johns. 534. The foreclosure operates as a new sale and purchase, and creates an estate in the mortgagee when there was none before. 3 Pow. Mortg. 1022, note B; Hill v. Price, 1 Dickens, 344; 2 Burrows, 978. And so mortgaged property cannot be sold on execution against the mortgagee, before possession acquired on foreclosure of the equity of redemption, although the debt be due, and the estate of the mortgagee has become, technically speaking, absolute at law. Huntington v. Smith, 4 Conn. 235; Blanchard v. Colburn, 16 Mass. 345; Jackson v. Dubois, 4 Johns. 216; Hitchcock v. Harrington, 6 Johns. 290; Collins v. Torry, 7 Johns. 278; Fish v. Fish, 1 Conn. 559. And it is on the same principle that a mortgagee in possession is accountable to the mortgagor for rents and profits. 1 Pow. Mortg. 171; 2 Mass. 435. And the former must account for the hire of mortgaged slaves while in possession. 1 Bibb, 195; 3 Bibb, 18; 6 B. Mon. 122. The principle, then, is clear, and sustained by the authority of all respectable courts, that the debt is the principal and the mortgage the incident; and as it is a rule in equity that what is once a mortgage is always a mortgage, (2 Story, Eq. Jur. 287; 1 Vern. 8; 1 Eden, 59; 7 Ves. 273; 7 Johns. Ch. 43; 1 Pow. Mortg. 116a,) it would seem to follow irresistibly that the mere fact of forfeiture could not change the relative situation of the parties so as to divest one of an estate and vest it in another, and that so long as the right of redemption exists, there is no change at all, and the mortgage, whether before or after forfeiture, remains a mere security for a debt. The object of the mortgage in this case was to indemnify Merrill, on account of his indorsement for the accommodation of Dawson, of the two notes mentioned in the bill, amounting to twelve thousand five hundred and seventy-eight dollars and twenty-two cents, and which were subsequently discounted at the Planters' Bank of Mississippi, at Natchez, for the exclusive benefit of Dawson, and the proceeds paid to him. Merrill was, in fact, security, and as such was obliged to take up these notes on the 4th of March, 1842; and at that point of time his right to proceed on the mortgage accrued. He was, then, actually damaged, and the condition of the mortgage was broken. The formal wording of the mortgage provides for the payment of the notes to Merrill, but that is quite immaterial, since the object is to ascertain the true nature of the transaction between the parties; and it was as I have stated it. Flagg v. Mann [Case No. 4,847]; 2 Story, Eq. Jur. 287; 1 P. Wms. 270; 1 Ves. Jr. 406. It has been well said, that courts of equity do not regard the forms of instruments, but look to the intention and give to the acts of parties such construction as that intention justifies and

requires. Barron v. Paxton, 5 Johns. 258; Reed v. Jewett, 5 Greenl. 96.

In all cases of indemnity it would seem to be a clear proposition, that actual damage must alone invoke redress, and so are adjudged cases. 1 Saund. 116, note 1; Douglass v. Clark, 14 Johns. 177; Aberdeen v. Blackmar, 6 Hill. 324; Churchill v. Hunt, 3 Denio, 321; Gilbert v. Wiman, 1 Comst. [1 N. Y.] 550. There was no default for which the mortgage could be foreclosed until the 4th of March, 1842, and he asserted his rights in the proper tribunal within six months afterwards, and in shorter time than non-residents usually allow themselves to seek a remedy in our courts. Looking to the true nature of the transaction, it is apparent that he could not foreclose before payment; because, otherwise, he might at any moment have possessed himself of the mortgaged property or the value, without paying a farthing, or being injured to the extent of a penny, in opposition to the clear intention of the parties, and against the well-established principles of equity. Marsh v. Lawrence, 4 Cow. 461. On the 4th of March, 1842, then Merrill was obliged to take up those notes by payment; on that day he became the legal holder of them; on that day his right to seek indemnity from the mortgaged property became perfect, and not until then. This is a point of some consequence, because it entirely destroys the chief ground of defence of the defendants, if ground that can be called, which is unsustained by authority and condemned by reason, namely, that the mortgagor retaining the possession of the slaves rendered the transaction fraudulent. In point of fact, so far from the mortgagor's having remained in possession after forfeiture, the very reverse is true, because he was dispossessed of the slaves in 1841 by the levy and sale under which the appellant claims; so that whether such possession would or would not be fraudulent, must be a purely speculative inquiry, not strictly applicable to the facts of the present case. But, as a matter of curiosity, let us see how the question stands on the score of authority.

Now I assert the general rule in the American and English courts to be, that the possession of personal property by the mortgagor, either before or after default or forfeiture, is not fraudulent, the possession being consistent with the deed. And that doctrine has been established by the supreme court of the United States in the cases of Hamilton v. Russell, 1 Cranch [5 U. S.] 309; U. S. v. Hooe, 3 Cranch [7 U. S.] 75; Conrad v. Atlantic Ins. Co., 1 Pet. [26 U. S.] 449. And by Judge Story in Wheeler v. Sumner [Case No. 17,501]; De Wolf v. Harris [Id. 4,221]. And in the following cases, decided in the state courts, namely, Head v. Ward, 1 J. J. Marsh. 280; Hundley v. Webb, 3 J. J. Marsh. 645; Maples v. Maples, 1 Rice, Eq. 300; Callen v. Thompson, 3 Yerg. 475; Sommerville v. Horton, 4 Yerg. 551; Bruce v.

Smith, 3 Har. & J. 499; Hambleton v. Hayward, 4 Har. & J. 443; McGowen v. Hoy, 5 Litt. [Ky.] 239; Haven v. Low, 2 N. H. 15; Ash v. Savage, 5 N. H. 547; Barron v. Paxton, 5 Johns. 258; Beals v. Guernsey, 8 Johns. 446; Craig v. Ward, 9 Johns. 197; Marsh v. Lawrence, 4 Cow. 461; Weller v. Wayland, 17 Johns. 102; Smith v. Acker, 23 Wend. 653; Planters' & Merchants' Bank v. Willis, 5 Ala. 780. In the English courts, in Stone v. Grubham, 2 Bulst. 225; Cadogan v. Kennett, Cowp. 432; Edwards v. Harben, 2 Term R. 587; Jarman v. Woolloton, 3 Term R. 618, 620; Eastwood v. Brown, 1 Ryan & M. 312; Reed v. Wilmott, 5 Moore & P. 564; 7 Bing. 583; Latimer v. Batson, 7 Dowl. & R. 110; 4 Barn. & C. 653; Martin v. Podger, 2 W. Bl. 701; 3 Barn. & Ald. 507; Lady Arundell v. Phipps, 10 Ves. 145. The same principles will be found in elementary treatises of high character, namely, Rob. Frauds, 550; Long, Sales, 71–76; 2 Kent, Comm. 518; 1 Pow. Mortg. 155; 2 Pow. Mortg. 646; Shep. Touch. 65. In Lady Lambert's Case, referred to in Shep. Touch. 65, it was determined that a mortgage or other conditional sale being good at the commencement, without a transfer of possession to the mortgagee or vendee, it will in law continue so, notwithstanding the retention of possession by the mortgagor or vendor, after forfeiture. In fact, to hold that possession by a mortgagor would even be prima facie evidence of fraud, would be an outrage on the common sense of society. Head v. Ward, 1 J. J. Marsh. 280. Jurists of this age content themselves with combating fraud, in fact, when discovered; and do not feel warranted in assuming its existence, either at law or equity, without conclusive proof. Not stopping at the explicit declaration that fraud shall never be presumed, they have thought it just to go further and say, that where an act does not necessarily import fraud, and may have been more probably done through a good than a bad motive, the presumption of innocence must prevail. Gregg v. Sayre, 8 Pet. [33 U. S.] 244; Fleming v. Slocum, 18 Johns. 405; 1 Story, Eq. Jur. 199.

An attentive examination of the cases with regard to the possession of property by the vendor, even after an absolute sale, and where such possession is not consistent with the nature or terms of the deed, will show that the weight of authority is in favor of this proposition, namely, that such possession as to creditors and purchasers, without notice, is only prima facie fraudulent, and may be explained, and is not, per se, fraudulent, admitting no explanation. But when we come to the consideration of mortgages, where, by the very nature and terms of such instruments, the possession of the mortgagor, both before and after default, is consistent with the deed itself, how is it possible for any one who has shaken from his robes the dust of the black letter tomes of past ages, to maintain before an enlightened court that such possession is either fraudulent or a badge of fraud; and what court, at this day, would have the courage to sanction such a doctrine?

It is worthy of observation that cases upon mortgages of chattels, where continuance of possession by the mortgagor occurs, do not turn upon any distinction between possession before or after forfeiture, but upon general principles, and thus completely refuting the idea, if such a fallacy requires refutation, that possession is unobjectionable before, but fraudulent after default. It is believed that there is no respectable case predicated upon any such distinction, and which, indeed, would be in disregard of the universal maxim —"Once a mortgage, always a mortgage." The decisions are the reverse. Bucklin v. Thompson, 1 J. J. Marsh. 223; Head v. Ward, Id. 281; McGowen v. Hoy, 5 Litt. [Ky.] 239. In considering mortgages of chattels, it must not be forgotten that prominent distinctions exist between a pledge or mortgage of goods which are consumed in the use, and a mortgage of slaves, which partake more of the nature of realty, and are so regarded in the Southern states, for many purposes not material to be here enumerated. They are a peculiar species of property, and on account of their value and capability of commanding ready money on sudden emergencies, are oftener subjects of mortgage than any other species of property denominated personal. And general practice as to slaves has so familiarized possession by the mortgagor that it is justly regarded as one of the conditions and incidents of the contract, whether the mortgage is recorded or not; and delivery of possession would be out of the common course. Maples v. Maples, Rice, Eq. 300; Fishburne v. Kunhardt, 2 Speer, 564. In the case last cited Frost, J., said: "The presumption of fraud from possession by a mortgagor after condition broken would be arbitrary, because contrary to almost universal experience." And in Maples v. Maples, above cited, which involved a mortgage of slaves, Chancellor Johnson said: "Permitting the mortgagor to remain 'in possession of the mortgaged property, although there is no covenant to that effect, is too common here to excite suspicion." And in the same case, on appeal, Chief Justice Dunkin held that possession by the mortgagor after forfeiture was neither fraudulent nor a badge of fraud requiring explanation. Indeed, in South Carolina, that doctrine has been so repeatedly adjudged as to have become a permanent landmark in her jurisprudence, as will be seen by the following cases, in addition to those cited, and to which particular attention is invited, especially as they relate to mortgages of slaves, and are, therefore, directly in point. Gist v. Pressley, 2 Hill, Eq. 325; Bank v. Gourdin, 1 Speer, Eq. 439, 458; Smith v. Henry, 1 Hill [S. C.] 23. On this question we are obliged to go to slave states for authority, because in non-slaveholding

ones sales and mortgages of slaves do not occur, and consequently no such cases arise. In the case of U. S. v. Hooe, 3 Cranch [7 U. S.] 73, above cited, Chief Justice Marshall says: "The difference is a marked one between a conveyance which purports to be absolute, and a conveyance which, from its terms, is to leave the possession in the vendor. If in the latter case the retaining of possession was evidence of fraud, no mortgage could be valid. The possession universally remains with the grantor until the creditor becomes entitled to his money, and either chooses, or is compelled to exert, his right." Barron v. Paxton, 5 Johns. 258.

It may not be inappropriate to observe, that in New York there is an express legislative act declaring that bills of sale, and mortgages of goods and chattels, shall be presumed to be fraudulent, when possession continues in the vendor or mortgagor, unless the person claiming under such sale or mortgage shall show the absence of an intent to defraud and the good faith of the transaction. 2 Kent, Comm. 528; Stoddard v. Butler, 20 Wend. 548; Butler v. Van Wyck, 1 Hill, 442. Hence decisions made after that statute, based upon or influenced by it, would not furnish a safe guide as to the general question here discussed, out of New York, that being among the few states where such a statute exists. And yet, even there, it has been repeatedly held, and has now become settled doctrine, that such possession is only prima facie evidence of fraud, and that almost any excuse is sufficient to destroy that presumption, and show the good faith of the transaction. Smith v. Acker, 23 Wend. 653; Fuller v. Acker, 1 Hill, 473; Butler v. Van Wyck, Id. 438, 447. "Perhaps," says Cowen, J., delivering the opinion of the majority of the court, in the last case, "it is necessary for the vendee or mortgagee, claiming in the face of a continued possession in his vendor or mortgagor to give evidence, slight at least, that the consideration was a true debt. Beyond this the verdict of the jury must be received as final. The convenience of the vendor or mortgagor, the declared purpose of enabling him to pay debts, even the comfort of his family, in retaining household furniture, according to their rank in life; in short, motives of humanity, and almost of mere courtesy, may, I think, on the authority of Smith v. Acker, 23 Wend. 653, be given in evidence to the jury, who may, if they please, allow them as legitimate excuses." And in Stoddard v. Butler, 20 Wend. 548, Senator Verplanck held this language: "Thus it happened here and in England, that, whilst the courts and the books laid down the rule broadly, and often applied it strictly, that 'unless possession accompanies and follows the deed, it is fraudulent and void,'—in the words of Justice Butler, Edwards v. Harben, 2 Term R. 587, adopted and incorporated in our own statute; yet first case after case, and then class after class, of exceptions was exempted from the rule, until with us there were no less than twenty-four distinct grounds of exemption; such as the kind of sale, purchase under execution or distress for rent, necessity, convenience, the custom of trade, the distance or situation of place, the relation of parties, motives of humanity or of friendship, and special circumstances of various kinds, more or less accurately defined, all enumerated by Judge Cowen. 3 Cow. 190."

At an early period of English jurisprudence, fraud was arbitrarily inferred from acts susceptible of a satisfactory explanation. But when the extension of commerce rendered the frequent transmission of property necessary, and created a corresponding demand for securities of various kinds, the harsh rules of a darker age yielded to a wiser policy, more compatible with the actual condition of mankind, and the usual course of human affairs. Twyne's Case, 3 Coke, 80, is a leading one on the subject of fraudulent sales of personal property. It was decided in the forty-fourth year of the reign of Elizabeth, in the court of star-chamber,—a tribunal which, becoming odious in consequence of its usurpations was abolished in the sixteenth year of the reign of Charles I.; and, as Lord Clarendon informs us, "to the general joy of the whole nation." The case derives no weight from adventitious circumstances, such as the dignity and authority of the tribunal, or the eminence and integrity of the judges; but it must be supported, if at all, on the intrinsic justice of its doctrines. Now, when we recollect that the proceeding was a criminal information on the part of the crown, and remember, too, the historical fact, that the tribunal itself was an instrument of tyranny in the hands of the sovereign, we shall not wonder that the information was sustained by "the whole court of star-chamber," and Twyne himself branded as a criminal. It is sufficient to observe that the resolutions in that case would hardly be adopted to their full extent in modern times, although it cannot be denied that there were such marks and signs of an intent to defraud creditors as might create suspicion and demand explanation, and might probably authorize fraud to be inferred as a question of law, without the intervention of a jury, if that course of practice could be tolerated at all. (1) The gift was general and absolute, without exception of apparel, or any thing of necessity. (2) The donor continued in possession and used them as his own, and by reason thereof traded and trafficked with others, and defrauded and deceived them. (3) It was made in secret. (4) It was made pending the writ. (5) There was a secret trust between the parties, for the donor possessed all and used them as his proper goods, notwithstanding the gift was absolute and unconditional. (6) The deed stated that the gift was made honestly, truly, and bonâ fide. These were the principal, and by no means slight, badges of

fraud in that celebrated case; and yet a court at this day would not feel warranted in holding such a transaction fraudulent per se as the court of star-chamber did, but would allow a party to explain it if in his power. To hold that retention of possession is per se fraudulent, is to establish an artificial rule not founded in truth nor upheld by the principles of justice. It is to destroy an important element of trade and commerce, and take us back to the primitive ages, where the transactions between men were few and simple, and where ignorance of writing and the absence of records, rendered actual delivery the more necessary as an indication of title. It is to crush the energies of the debtor by depriving him, in many cases, of the means of extricating himself from embarrassment without absolute ruin. Harshness to debtors has yielded to an enlarged and liberal philanthropy. Imprisonment for debt, the relic of a barbarous age, is fast disappearing everywhere. The debtor cannot be put in chains and sold to foreigners, nor can his body be cut in pieces; both of which were allowed by the laws of the twelve tables of Rome. Cooper's Justinian, 658. In place of such cruelty certain property, necessary for his sustenance and comfort, is, in most if not all of the states, preserved to him against the rapacity of the creditor, and the exemption of homesteads is now becoming a very general policy in our country. In the strongest cases in favor of the proposition that possession must accompany the deed in absolute sales, as Twyne's Case, 3 Coke, 80; Stone v. Grubham, 2 Bulst. 225; Cadogan v. Kennett, Cowp. 432; and Edwards v. Harben, 2 Term R. 594, it is expressly conceded, that if the conveyance is conditional, or if, by the terms or nature of the instrument or deed, possession is consistent therewith, such possession is not only not per se fraudulent, but not even a badge of fraud, requiring any explanation at all. The weight and respectability of authority undoubtedly is, that possession by the vendor, even after an absolute sale, and where such possession is incompatible with the deed, is only primâ facie evidence of fraud, and subject to explanation, and is not per se fraudulent. Kidd v. Rawlinson, 2 Bos. & P. 59; Lady Arundell v. Phipps, 10 Ves. 145; Beals v. Guernsey, 8 Johns. 452. And the same doctrine has been established by the supreme court of Arkansas in the cases of Cocke v. Chapman, 2 Eng. [7 Ark.] 200; Field v. Simco, Id. 275, and cases there cited; Costar v. Davies, 3 Eng. [8 Ark.] 218.

There is a principle connected with this question of possession which deserves consideration. The only reason why absolute sales of chattels, where there was no transfer of possession, were declared fraudulent and void, was on the supposition that there was a secret trust between the parties, and that the retention of possession was calculated to deceive those with whom the vendor might subsequently deal. As expressed by Justice Bur-

net (1 Atk. 163), "Possession can be no otherwise a badge of fraud than as it is calculated to deceive creditors; as to the possession of goods, I have no way of coming to the knowledge of the owner but by seeing who is in possession of them." Such a sale is held fraudulent and void as to creditors and purchasers, although good between the parties themselves. Whenever the rule is enforced it is for the benefit of creditors and purchasers, and they are the only persons who can avail themselves of it. Twyne's Case, 3 Coke, 80; Long, Sales, 67. Now where a creditor or purchaser has notice of a bona fide sale for a valuable consideration, he cannot say or pretend that he has been deceived, deluded, or defrauded, although the vendor retains possession, uses the property as his own, and such possession is inconsistent with the deed or contract. With such knowledge, to allow the second to overreach the first purchaser would be to sanction a fraud. In such a case the retention of possession would be of no consequence, and could not be available for any purpose. This doctrine is sustained by the case of Sanger v. Eastwood, 19 Wend. 514, where it was held that a purchaser of personal property, with notice of the existence of a mortgage covering it, cannot avail himself of the facts, that the mortgage was unaccompanied by delivery of possession, and that it had not been filed for record. And from other cases the rule is deducible, that if a creditor has knowledge of a sale, the mere retention of possession is a matter of no consequence. Steel v. Brown, 1 Taunt. 381; Sturtevant v. Ballard, 9 Johns. 337; Barron v. Paxton, 5 Johns. 258; Ryall v. Rolle, 1 Atk. 165; Bissell v. Hopkins, 3 Cow. 166. It is said that there is no clause in this mortgage, authorizing the mortgagor to retain possession, and that that is a badge of fraud. It is sufficient to reply that it was not necessary; because, first, the transaction was of such a nature that the mortgagee was not entitled to the possession of the slaves until he paid the notes; and, second, the effect of the mortgage is the same as if it contained such a clause, for this right in the mortgagor is incidental to a mortgage, and implied by law without such clause.

"There is usually in English mortgages," says Kent, "a clause inserted in the mortgage that until default in payment the mortgagor shall retain possession. This was a very ancient practice, as early as the time of James I., and if there be no such express agreement in the deed, it is the general understanding of the parties, and at this day almost the universal practice, founded on a presumed or tacit assent." 4 Kent, Comm. 148; 5 Johns. 258; 2 Hill, Eq. 328. In mortgages of slaves, very general practice has familiarized possession by the mortgagor, as one of the conditions and incidents of the contract. It is too common and universal to excite suspicion. Fishburne v. Kunhardt, 2 Speer, 564; Bank v. Gourdin, 1 Speer, Eq. 439, 458;

Maples v. Maples, Rice, Eq. 300. The general custom in Arkansas, as proved by witnesses, accords with this doctrine, and it is just and reasonable, and a different one could not be tolerated as to slaves. But even if it were necessary to show any circumstances in this case by way of explanation of possession, the record contains an abundance of reason to justify it. 1. The nature of the transaction between Dawson and Merrill, which was only to secure Merrill from loss and damage, in consequence of the indorsement of these notes, and not in fact allowing Merrill the right of possession at all; until he was damnified by the payment of the notes, which was not until the 4th of March, 1842, and then the negroes had been sold. 2. That at the time Dawson made the mortgage, Nov. 25, 1837, he was a wealthy and solvent man, with a large property, and able or supposed to be able to pay all his debts, and who did not become embarrassed until long afterwards. 3. The mortgage was made in Natchez, Mississippi; the negroes were upon Dawson's plantation, in Jefferson county, Arkansas, and the mortgage was placed upon record, thus showing that it was not a secret transaction. 4. Merrill was then, and ever has been, a non-resident of this state, within the saving in the statute of limitations, even if it could be pretended that any statute applied. This is no stale demand; nor is it pretended that Merrill slept upon his rights, for after he paid the notes, he immediately commenced proceedings to subject the mortgaged property. 5. The whole testimony shows, and Dawson's answer under oath admits, that the mortgage was made bona fide and for a valuable consideration, and to secure Merrill; and the conduct of the latter proves the fact. In addition to this, the defendants had actual, if not constructive, notice, as will presently appear, and they purchased in their own wrong. 6. Last of all, the possession of Dawson, while he did have possession, was consistent with the deed of mortgage, and in fact Merrill was not entitled to possession at all until March 4, 1842. That there was at any time, any actual fraud in the transaction, has not been proved. There is no circumstance or fact which would justify even a suspicion of fraud as to Merrill. The idea that they colluded with each other to defraud a subsequent creditor, to defraud a person who was not a creditor of Dawson until long afterwards, is absurd. As to subsequent acts and declarations of Dawson, referred to by some of the defendants in their answers, suffice it to say, they are not proved, and if they were proved, they could not affect Merrill in the slightest degree, he being wholly unconnected with them. That there was any fraud in fact is a naked assumption, without the slightest evidence to sustain it.

II. It is insisted by the defendants, that this mortgage was not legally acknowledged, and that it was not in fact properly or legally recorded, although the recorder certified under his hand and official seal, on the original mortgage, that it was duly recorded in book B, page 174, on the 29th of December, 1837, and hence that it does not act as constructive notice. It is true that the record does not show on what day it was recorded, but that is not material, nor can the certificate of the registering office be contradicted, as we shall presently perceive. This was such an instrument as the law authorized to be recorded. The law in force in 1837 required the recorder to record all deeds and conveyances which were presented to him for that purpose. Ter. Dig. 454. It does not limit such deeds and conveyances to real property; personal chattels would therefore be embraced. It does not require any particular mode of acknowledgment or authentication, or indeed any at all. Act 1804; Ter. Dig. 454. The same act, under the title "Mortgages," (section 1, Ter. Dig. 433,) requires every mortgagee of real or personal estate, when the mortgage is satisfied, at the request of the mortgagor, to "enter satisfaction upon the margin of the record of such mortgage recorded in said recorder's office." The second section prescribes a penalty for failure to do so. The fifth section of same act gives the same remedy upon a "mortgage of personal property" as upon real estate. Ter. Dig. 434. These provisions show conclusively that mortgages of personal property were authorized to be recorded, (Hodgson v. Butts, 3 Cranch [7 U. S.] 140; 1 Pet. Cond. R. 476; McKeen v. Delaney's Lessee, 5 Cranch [9 U. S.] 22; 2 Pet. Cond. R. 179,) whether such recording would operate as constructive notice or not. The mortgage was made in the state of Mississippi, and was properly acknowledged before the judge of the probate court of Adams county, an officer competent to take the acknowledgment of deeds in that state. How. & H. Dig. p. 368, § 99; Talbot v. Simpson [Case No. 13,730]. A judge of probates in Mississippi is a judge of a county court, within the meaning of the act of congress of 1789. The recorder acts ministerially and not judicially in the matter of recording deeds. Elliott v. Piersol, 1 Pet. [26 U. S.] 341; 2 Bin. 40; Dawson v. Thruston, 2 Hen. & M. 135. When a deed, therefore, is presented to the recorder for record, he ought to admit it, and has no authority to reject it. Id. The recording of a deed is evidence that it was legally proved and admitted to record (Talbot v. Simpson [supra]), and the certificate of the registering officer cannot be impeached or controlled by producing the record and showing a variance (Ames v. Phelps, 18 Pick. 314), or traversing such certificate. Rex v. Hopper, 3 Price, 495. If after a deed is left for record with the clerk to be recorded, he delivers it to the grantor without recording it, this is a breach of official duty for which the clerk would be liable to creditors for any injury they might sustain, but would not render the deed void or impair the rights of the grantee. Bank of

Kentucky v. Haggin, 1 A. K. Marsh. 307: Avent v. Read, 2 Stew. [Ala.] 488. Hence if a deed after it is received by the clerk remains unrecorded through no fault of the grantee, until after an attachment of the land embraced in the deed, the attachment shall not prejudice the grantee. Franklin v. Cannon, 1 Root, 500; Hartmyer v. Gates, Id. 61; Judd v. Woodruff, 2 Root, 298. The same principle is substantially decided in McGregor v. Hall, 3 Stew. & P. 397.

The principle upon which these cases rest is, that the officer is presumed to discharge his duty, and that if he omits to do so, the grantee or mortgagee shall not be prejudiced —shall not lose his rights, which would indeed be against the dictates of justice. It is not required of him "that he should stand by and see that the clerk does his duty." Beekman v. Frost, 18 Johns. 563, 1 Johns. Ch. 300. In the case of King v. Hopper, 3 Price, 495, it was expressly held, that the lodging of a deed in the officer's hands is an enrolment. "And indeed," says Richards, B., "the affairs of mankind would be in a dreadful condition if it were not so, for when the deed is once lodged, the party interested in it loses all dominion and control over it, and it is from that moment left entirely with the officer. If an actual and complete enrolment were necessary, this deed had not been enrolled on the 22d nor on the 24th of July; but the cases all decide that that is not necessary, and that the instant a deed is lodged in the office, from that instant it must be considered as enrolled, and the practice accords with that rule." The same principle was explicitly asserted in Garrick v. Williams, 3 Taunt. 544. In McDonald v. Leach, Kirb. 72, it was held, that where a deed is received for record, this entry made upon it by the register and the deed lodged in the office, is equivalent to actual registration. 2 Hil. Abr. p. 432, § 87; McConnell v. Brown, Litt. Sel. Cas. 462. When all the requisites have been performed which authorize a recording officer to record any instrument whatever, and the order for that purpose has been given, the instrument in law is considered as recorded, although the manual labor of inserting it in a book kept for that purpose may not have been performed. Marbury v. Madison, 1 Cranch [5 U. S.] 147; 1 Pet. Cond. R. 273, 274. The receiving of an instrument, marking it filed by the clerk, and signing such indorsement officially, is a sufficient recording to protect the rights of the grantee from subsequent incumbrances. See cases above cited. Nor is it necessary that the date of recording should be put upon the record. If the recording of the deed with the acknowledgment is prior to the opposing title, it is sufficient. Galusha v. Sinclear, 3 Vt. 394; Morey v. McGuire, 4 Vt. 327; Wickes v. Caulk, 5 Har. & J. 36; Rex v. Hopper, 3 Price, 495.

It has been held that registry acts are remedial, and ought to be liberally and beneficially construed. Jackson v. Town, 4 Cow. 599; James v. Morey, 2 Cow. 247; Jackson v. Bowen, 7 Cow. 13; 2 Pow. Mortg. 624a. Hence a memorial of registry containing the substance of a covenant in a lease, without expressly setting it forth, has been held to be a good registration. McAlpine v. Swift, 1 Ball & B. 285. In Latouche v. Dunsany, 1 Schoales & L. 157, Lord Redesdale said that if registration was to be considered notice, it must be notice whether the deed be duly registered or not. A clerk may record a deed made by an agent without inquiring into the validity or fact of agency. 3 A. K. Marsh. 92. The registry of a deed executed by several, but acknowledged by one only, is good and sufficient. Shaw v. Poor, 6 Pick. 86. A clerical error or mistake does not vitiate the registry of a deed. As where a term assigned was of sixty-one years, and was stated in the enrolment to be sixty-two years; or, as where the consideration was 250 pounds and was enrolled 280 pounds; or, as where the name of the trustee was enrolled "Seden," when it was spelt "Soden" in the deed, and where the assignment was stated to be Seden, habendum to Corrie; in these cases the enrolment was held good. Ince v. Everard, 6 Term R. 545; Wyatt v. Barwell, 19 Ves. 435; 2 Pow. Mortg. 621, note. Where lands lie in several counties, it is sufficient to record the deed in any one of them. Scott v. Leather, 3 Yeates, 184; Duffield v. Brindley, 1 Rawle, 91. Deeds were enrolled at the common law for safe custody. 1 Salk. 389. The enrolment of a deed under the statute 27 Hen. VIII. c. 16, is a record, and, therefore, is not traversable. Rex v. Hopper, 3 Price, 495. The indorsement of the registry of a deed on the deed itself is sufficient evidence of enrolment. Pyne v. Dor, 1 Term R. 55. The production of a deed with the memorial indorsed, is sufficient proof of the enrolment. Compton v. Chandless, 4 Esp. 18; Bull. N. P. 229; Kinnersley v. Orpe, 1 Doug. 56. The date of enrolment indorsed by the clerk of enrolments on the deed, is conclusive evidence of the date and fact of enrolment. Rex v. Hopper, 3 Price, 495; 1 Saund. Pl. & Ev. 425; and there can be no averment or proof against it.

The object of every registry act is to afford publicity, and if a deed was in reality recorded, before a subsequent incumbrance accrued, it would be strange if the subsequent incumbrancer could say, that although the deed was on record, yet it afforded no notice, because the precise day of placing it there did not appear from the record. That would be to say, that the registry is utterly void, unless the date of it appears from the record, which would entirely destroy the beneficial construction which has ever been placed on registry acts, and would be at war with the first principles of justice as well as adjudged cases. Under the registry act of 27 Hen. VIII., a party might be permitted to give evidence of the day of an enrolment having been actually made, because it was not the usage to insert on the record the particular day.

Rex v. Hopper, 3 Price, 495; 1 Exch. 403. It has, as I think, been demonstrated (1) that the mortgage from Dawson to Merrill was lodged and filed for record December 29, 1837, and was from that day, in contemplation of law, enrolled, so as to protect the rights of the mortgagee; (2) that no evidence is admissible or can be received to impeach or contradict the certificate of the recorder indorsed on the mortgage. But if such evidence can be received, then I contend (3) that the mortgage was actually recorded, and that it is immaterial whether the manual labor of transcribing it was performed by the clerk in person, by Dawson, or any other amanuensis, provided the clerk adopted and sanctioned the act, which he did, as is manifest from his certificate, and which certificate is not to be controverted by parol proof, for that would be to set up inferior in the place of the higher evidence.

In England, registration is not of itself notice, and a mortgagee or purchaser is not bound to search the register; but if he does, he will be deemed to have actual notice of all incumbrances on the register, within the period of his search, (2 Pow. Mortg. 631a, note; Wiseman v. Westland, 1 Younge & J. 117; Bushell v. Bushell, 1 Schoales & L. 103; Latouche v. Dunsany, Id. 157,) thus showing it may be made the medium of actual notice. But in this country registry is constructive notice to all the world. Johnson v. Stagg, 2 Johns. 510; Frost v. Beekman, 1 Johns. Ch. 299; Peters v. Goodrich, 3 Conn. 146; Grant v. Bissett, 1 Caines, Cas. 112; Parkist v. Alexander, 1 Johns. Ch. 398; St. Andrews' Church v. Tompkins, 7 Johns. Ch. 14. Where a person claims to be a purchaser without notice, he is bound to deny, fully and in the most precise terms, every circumstance and fact from which notice might be inferred (Jerrard v. Saunders, 2 Ves. Jr. 454; Frost v. Beekman, 1 Johns. Ch. 303); and this he must do, although notice is not charged in the bill. 3 P. Wms. 244, note; Bodmin v. Vandenbendy, 1 Vern. 179; Murray v. Ballou, 1 Johns. Ch. 573, and cases there cited; Murray v. Finster, 2 Johns. Ch. 155; Galatian v. Erwin, 1 Hopk. Ch. 55, 56; Carr v. Callaghan, 3 Litt. [Ky.] 365. "If a purchaser wishes to rest his claim on the fact of being an innocent bona fide purchaser, he must deny notice, even though it be not charged, and he must deny it positively, not evasively; he must even deny fully and in the most precise terms every circumstance from which notice may be inferred." Per Chancellor Kent, in Denning v. Smith, 3 Johns. Ch. 345; Pillow v. Shannon, 3 Yerg. 511. Every case on the registry acts has been determined on the ground that those acts do not affect the great fundamental principles of equity; but that every purchaser claiming under a registered deed, with notice of a prior incumbrance or purchase, is subject to any equity which such prior incumbrance or purchase may create. Chandos v. Brownlow, 2 Ridg. App. 428, vide 3 Sugd. Vend. p. 307, and notes b and 1, and authorities there cited; 1 Story, Eq. Jur. 385; Cotton v. Hart, 1 A. K. Marsh. 58. So, too, in Portwood v. Outton's Adm'r, 3 B. Mon. 253, it is said, that a mortgage of land without seal or scroll was not a recordable instrument within the statute, so as to make the record constructive notice, yet that it was good against a subsequent purchaser with notice of its existence.

III. But, supposing there was no constructive notice arising from the registry of the mortgage, the defendants had actual notice. It is a just and salutary rule, calculated to preserve good faith and protect the rights of individuals, that whatever is sufficient to put a party upon inquiry is good actual notice. Johnson v. Bloodgood, 1 Johns. Cas. 53; Sterry v. Arden, Id. 267; 1 Story, Eq. Jur. 389; Ferrars v. Cherry, 2 Vern. 384; Smith v. Low, 1 Atk. 490; Taylor v. Stibbert, 2 Ves. Jr. 437; Daniels v. Davison, 16 Ves. 250; Newman v. Kent, 1 Mer. 240; Green v. Slayter, 4 Johns. Ch. 46; Peters v. Goodrich, 3 Conn. 146; Ward v. Fox, Hughes [Ky.] 431; Johnston v. Gwathmey, 4 Litt. [Ky.] 317; Roberts v. Stanton, 2 Munf. 129; Pitney v. Leonard, 1 Paige, 462; Burkart v. Bucher, 2 Bin. 466; Newl. Cont. 54; Sugd. Vend. 498. In a great variety of cases it must necessarily be a matter of considerable difficulty to decide what circumstances are sufficient to put a party upon inquiry. Such, certainly, however, as to facts, as that a reasonable mind could not hesitate to deem sufficient to call for further inquiry, and to put a party upon his diligence, is good actual notice. 1 Story, Eq. Jur. 389; Nantz v. McPherson, 7 T. B. Mon. 599; Jackson v. Sharp, 9 Johns. 166; Jackson v. Burgott, 10 Johns. 460; Dunham v. Dey, 15 Johns. 567; 2 Pow. Mortg. 561. Examples of actual and implied notice, sufficient in equity. In Fry v. Porter, 1 Mod. 300, Hale, C. B., speaking of the point of notice, said: "Here are several circumstances that seem to show there might be notice, and a public voice in the house, or an accidental intimation, &c., may possibly be sufficient notice." Butcher v. Stapely, 1 Vern. 364; 2 Pow. Mortg. 561. A verbal communication to a purchaser before he receives a conveyance, that A. B. has a claim to the land, is a sufficient notice to charge the purchaser with A. B.'s equity. Currens v. Hart, Hardin, 37. Lis pendens is sufficient notice. Green v. Slayter, 4 Johns. Ch. 38. A violent presumption of notice or proof of facts which imply it is sufficient. Cunningham v. Buckingham, 1 Ohio, 265; 2 Hil. Abr. p. 458, § 246. Where a grantor notified his grantee in writing, that the title of the land was in another as collateral security, to pay certain notes, this was held a sufficient notice to the purchaser, although nothing was said of date, amount, or time of payment. Dunham v. Dey, 15 Johns. 567. H. went as an agent for the defendant to purchase a lot of B., who refused to sell, and told him he had already conveyed the lot to

G., one of the lessors of the plaintiff. "Here, then," says the court, "was a direct and positive notice to the agent of the defendant," equivalent to a notice to his principal. Jackson v. Sharp, 9 Johns. 168. Notice of a prior incumbrance may be presumed from inadequacy of price. 2 Pow. Mortg. 578a, note. On the principle, that whatever puts a party on inquiry is good notice in equity, it is observable that if a person be apprised that the legal estate is in a third person at the time he purchases, he will be bound to take notice of the trusts with which the legal estate is clothed. 2 Freem. p. 137, pl. 171; 2 Pow. Mortg. 578, note. While H. was in negotiation for the purchase of a lot, he was informed that G. claimed the lot and had title, and was cautioned against purchasing, but he made the purchase and took a quit-claim deed. Kent, C. J., held that this was actual notice beyond all controversy, and that the purchase was subject to G.'s prior right. Jackson v. Burgott, 10 Johns. 460. A subsequent purchaser admitted in his answer that before the execution of the deed to him, he had heard that the grantor had made some provision for his daughters, out of property in Greenwich street, and there was no evidence in the case that the grantor owned any other property in that street, except the lots included in the settlement. Chancellor Kent held this purchaser chargeable with constructive notice, or notice in law of this settlement, "because he had information sufficient to put him on inquiry." Sterry v. Arden, 1 Johns. Ch. 267. Where a sheriff stated and declared to all bidders, at the time of the sale, that the property offered was subject to a mortgage, this was deemed sufficient actual notice to charge a purchaser at the sale with such mortgage. Muse v. Letterman, 13 Serg. & R. 168; Lindle v. Neville, Id. 227.

Notice sometimes resolves itself into matter of fact, and sometimes into matter of law; each case, to a great extent, depends upon its own circumstances as to notice. 1 Story, Eq. Jur. 387–389; Com. Dig. "Chancery," 4, c. 2. If a man purchases land, and is informed of the existence of a lease, this is sufficient to put him on inquiry, and is therefore good notice; or if he is informed that the estate is in the possession of tenants, he is bound to inquire into the claims of those tenants, and is affected with notice of all the facts as to their estates, and is bound by the leases they hold. Taylor v. Stibbert, 2 Ves. Jr. 437; Hiern v. Mill, 13 Ves. 118; Hall v. Smith, 14 Ves. 426; 1 Story. Eq. Jur. 389, note 3 and authorities therein cited; St. Andrew's Church v. Tompkins, 7 Johns. Ch. 16. The recital in a deed is notice; thus the recital of a letter of attorney, by which a deed was made, is notice to the purchaser of the existence of such a power. Jackson v. Neely, 10 Johns. 374; Cuyler v. Bradt, 2 Caines, Cas. 326; 2 Pow. Mortg. 620a; 1 Story, Eq. Jur. 389; Hall v. Smith, 14 Ves. 426. Evidence that a tenant cut wood on the land is constructive notice to the demandant, that the former held a deed of the land. Kendall v. Lawrence, 22 Pick. 540. So possession of land is notice to a purchaser, and he must inquire of the title of the occupant. Knox v. Thompson, 1 Litt. [Ky.] 352; Fitzhugh v. Croghan, 2 J. J. Marsh. 434; 4 T. B. Mon. 196; 2 J. J. Marsh. 180; Brown v. Anderson, 1 T. B. Mon. 201. The deposit of title deeds as a security for money, constitutes an equitable mortgage; and a person, knowing such deposit, cannot take a mortgage or purchase to the prejudice of the equitable incumbrance so created. 1 Story, Eq. Jur. 383, 384. Notice may be either actual and positive, or constructive, or implied. Id. 387. And the fact of notice may be inferred from circumstances as well as proved by direct evidence. 4 Mass. 637. "Any circumstance," says the court in Knox v. Thompson, 1 Litt. [Ky.] 353, "that puts another on the search, is sufficient to convict him of notice." Nothing can destroy the effect of actual notice. 2 Pow. Mortg. 617, note, 572a. It is also a rule, that where there is notice of a deed the purchaser is bound by the effect and consequence of it, whatever opinion he may entertain as to its validity. Thus in the case of Ferrars v. Cherry, 2 Vern. 384, it was held, that the defendant purchased with notice of the settlement, but he contended that the settlement did not recite or contain any notice that it was made pursuant to articles entered into before the marriage, and that the settlement was therefore voluntary, and fraudulent as to him; but the court said "he ought to have inquired of the wife's relations, who were parties to the deed, whether it was voluntary or made pursuant to an agreement before marriage; and, having notice of the deed, must at his peril purchase, and be bound by the effect and consequences of the deed." 2 Pow. Mortg. 572, 573. So in Brackett v. Wait, 6 Vt. 424, it was expressly held, that where a person has notice of a prior unrecorded deed, he is not protected from the effect of such notice by any erroneous opinions as to its validity, and must purchase at his peril.

There is another point connected with notice, which seems to me entitled to great weight, and it is this: By the English registry acts, recording is not constructive notice; but, if the records are searched, that is actual notice to a purchaser of all incumbrances within the period of his search. 2 Pow. Mortg. 631b, note. In this country the unauthorized registry of a deed would not amount to constructive notice. In all the cases upon this class of deeds in the American courts, the principle has not been carried further than that they are not constructive notice; but it has not been determined, that, when such deeds are actually recorded in a register office, that a search for and examination of the deed so recorded, would not be actual notice, or a circumstance from which notice would be presumed. On every principle of reason it would seem that the actual fact of examining a record, in an office where incumbrances are pre-

served, although the deed was not authorized to be recorded at all, would, at least, be equivalent to a verbal communication of an incumbrance, and would have the advantage of furnishing more precise and certain information,—such, at least, as would be sufficient to put a prudent man upon inquiry, which is all that is necessary to constitute actual notice. In Morrison v. Trudeau, 1 Mart. [N. S.] 384, it was held that a deed unduly registered, either from want of valid acknowledgment, or otherwise, will, notwithstanding, operate as notice to third persons. I understand the court to declare that such a record may constitute medium of actual notice, as, for example, by examination or means of a like character. So in the British courts judgments on record are not of themselves notice, and yet if it can be proved that a party searched the records of the court, it will be enough to bind him with notice of all judgments entered, though he might have overlooked them. 2 Pow. Mortg. 597, and notes. But it is unnecessary to pursue the point for the proof of actual notice, independent of this circumstance, is clear and conclusive, leaving no doubt on the mind as to the knowledge of the defendants of the existence of the mortgage at the time of their purchase. It was proclaimed at the sale,—the record book, where the mortgage was recorded, was lying open near at hand and all persons referred to it, and some of the defendants made search. Proof could not be more conclusive.

IV. Notice of a lien or incumbrance on property, binds the purchaser, if received by him at any time before the execution of the conveyance and payment of the purchase-money, and arrests all further proceedings towards the completion of the purchase; and, if persisted in, it is held to be done in fraud of the equitable incumbrance. 2 Pow. Mortg. 617; 2 Fonbl. Eq. bk. 2, c. 6, § 2, note I; Id. § 3, note M; Id. bk. 3, c. 3, § 1, note B; Taylor v. Stibbert, 2 Ves. Jr. 441; Jewett v. Palmer, 7 Johns. Ch. 68; Blair v. Owles, 1 Munf. 38; Le Neve v. Le Neve, 3 Atk. 654; Story v. Lord Windsor, Id. 304; 1 Paige, 208–284; Frost v. Beckman, 1 Johns. Ch. 301. In Wormley v. Wormley, 8 Wheat. [21 U. S.] 449, it is said by Story, J., to be a settled rule in equity, that a purchaser without notice to be entitled to protection, must not only be so at the time of the contract or conveyance, but at the time of the payment of the purchase-money. Mead v. Orrery, 3 Atk. 238. And in Jewett v. Palmer, 7 Johns. Ch. 68, above cited, Chancellor Kent said: "A plea of a purchase for a valuable consideration without notice, must be with the money actually paid; or else, according to Lord Hardwicke, you are not hurt. The averment must be, not only that the purchaser had not notice at or before the time of the execution of the deeds, but that the purchase-money was paid before notice. There must not only be a denial of notice before the purchase, but a denial of notice before payment of the money. Harrison v. Southcote, 1 Atk. 538;

Story v. Lord Windsor, 2 Atk. 630. Even if the purchase-money be secured to be paid, yet, if it be not in fact paid before notice, the plea of a purchase, for a valuable consideration, will be overruled. Hardingham v. Nicholls, 3 Atk. 304." Now Roane and Taylor, in their answers, show that they had notice before the sale; they do not deny notice. Fish denies notice generally; Fowler states that he did not receive actual notice until after the negroes came to his possession. In none of these answers is there any denial, or any thing equivalent to it, that the purchase-money was actually paid when the notice was received. This is absolutely necessary, as shown by the above cases. It must be positively averred in the answer, and cannot be inferred or supplied by intendment; and without it the plea of a purchase for a valuable consideration without notice, must be overruled. It is to be observed also, that Roane, Taylor, and Fish, do not show themselves to be bonâ fide purchasers for a valuable consideration at all. They do not specify the judgment under which they purchased,—do not show, or exhibit, or refer to, or produce a judgment and execution,—which they were bound to do, to bring themselves within the character of purchasers.

The rule is, that an unregistered mortgage has preference over a subsequent docketed judgment. But if the property mortgaged be sold by the sheriff, prior to the registry of the mortgage, a bonâ fide purchaser at the sheriff's sale, without notice, will be protected against the mortgagee, if he has actually paid the consideration, and shows a conveyance, good in form, by the recording of which he obtains priority as a purchaser. Jackson v. Terry, 13 Johns. 472. In fact a sheriff's deed, in the absence of statutory provisions, cannot be received in evidence at all, unless the judgment and execution are produced, for the purchaser claims under the judgment and execution, which is the only authority for the sheriff to sell. Bowen v. Bell, 20 Johns. 338; Weyand v. Tipton, 5 Serg. & R. 332; Dunn v. Meriwether, 1 A. K. Marsh. 158; Cox v. Nelson, 1 T. B. Mon. 94; Hinman v. Pope, 1 Gilman, 136. Nor do those persons show any deed from the sheriff, and in these particulars have failed to show themselves purchasers. But be this as it may, the defendants, Roane, Taylor, Fish, Fowler, and Badgett, had actual notice. Badgett, in addition to having notice himself, purchased from Fowler, who had notice. The purchasers of these negroes could acquire no better right than Dawson himself had to them. The officer only professed to sell the right and interest of Dawson, whatever it might be, as his deposition amply proves. The defendants who purchased stand in Dawson's shoes,—the sale, if valid, was a judicial assignment or transfer of Dawson's interest, subject, undoubtedly, to all subsisting prior incumbrances, and to the rights of third persons. To that sale the rule of caveat emptor most strongly applies. Merrill was neither party nor privy to the judgment under which

the negroes were sold, and of course his rights were not affected by any proceeding under it. If A. is in the possession of a slave, and it is sold as his property, but in fact belongs to B., may not the owner reclaim his property; and is it any defence for the purchaser to say that he purchased without notice, that B. was the true owner? A court of justice would inform him that he bought at his peril, and could acquire no greater right than A. had to the property. This principle, necessary to preserve the sacred rights of property, rests upon a foundation, unconnected with the doctrine of notice of another's right. It rests upon the great principle applicable to all sales of personal property, whether by the agreement of parties or by the authority of law under judicial process, that the purchaser must look to the title and buy at his peril,—that the maxim caveat emptor must govern. Ashe v. Livingston, 2 Bay, 85; Long, Sales, 164; Clute v. Robison, 2 Johns. 595; 2 Pow. Mortg. 589a.

VI. Roane, Taylor, Fowler, Fish, and Badgett, are liable personally for the value of the slaves, in case they do not surrender them. Blair v. Owles, 1 Munf. 38; Hughes v. Graves, 1 Litt. [Ky.] 317. They were appraised at the sale by three respectable and disinterested persons, under oath, according to the appraisement law, and that must necessarily constitute the criterion of value. The testimony proves that they were very likely negroes. The parol testimony very satisfactorily proves that they were not valued beyond what they were worth. I insist upon that criterion of value, for it is the only one to which we can rightfully resort.

VII. It is perfectly manifest from the pleadings and proofs in the cause, that the negroes will be insufficient to discharge the mortgage debt, and that it is, therefore, necessary to apply the hire thereto, which hire is claimed of the defendants by the complainant, in his bill. The defendants are personally accountable for the reasonable hire of the slaves, at least from the time of the service of process upon them, which is equivalent to a demand. Graves v. Sayre, 5 B. Mon. 390; 7 Dana, 227; 2 B. Mon. 159. As to other cases relative to hire, vide Reed v. Lansdale, Hardin, 6; 3 Bibb, 18; 6 T. B. Mon. 122; 7 T. B. Mon. 544; 4 T. R. Mon. 347; Mims v. Mims, 3 J. J. Marsh. 108. In detinue the institution of suit is a sufficient demand to entitle the plaintiff to the hire of slaves by way of damages from that time. Tunstall v. McClelland, 1 Bibb, 186; Cole's Adm'r v. Cole, 4 Bibb. 340; Jones v. Henry, 3 Litt. [Ky.] 49; Carroll v. Pathkiller. 3 Port. [Ala.] 279. And so in this case, the hire must be computed at least from the service of the writ of subpoena on the defendants.

A. Fowler argued the case for himself and other defendants fully and elaborately, on the principal grounds (1) that as the possession of the slaves did not accompany and follow the mortgage, but remained continuously in the possession of the mortgagor, the mortgage was, therefore, fraudulent and void as to creditors and purchasers; (2) that it was not properly acknowledged or recorded, and that the defendants had no constructive notice, and no sufficient actual notice of its existence, and that they were innocent and bona fide purchasers, for a valuable consideration, without notice; (3) that the mortgage was fraudulent in fact, and was designed and intended to protect Dawson's property from creditors, and that the suit was prosecuted for Dawson's benefit. These points and others were argued with great ability by Mr. Fowler, but the reporter having no notes of it, or of the authorities cited and relied on, is unable to insert them here, which he would otherwise do with great pleasure. On the 18th of July, 1846, the defendants filed exceptions to depositions taken by complainant.

JOHNSON, District Judge. The first exception points to the omission of the name of James L. Dawson, as one of the defendants, in the caption of the depositions of Trapnall, Dorris, Walker, White, Bogy, and Hammett; but his name appears as a defendant in the order of the court appointing commissioners, in the notices served on the defendants, in the caption of the interrogatories which were filed and attached to, and issued with, the commission, in the commission which issued under the authority of this court, and in the oath of the commissioners to execute the same. The commissioner states, in the caption of the depositions, that they were taken in pursuance of said commission and interrogatories. in each of which the names of all the defendants are fully stated. Under these circumstances, it cannot, in my judgment, be said, that the depositions do not appear to be taken in this case, and this exception is overruled. [Keene v. Meade] 3 Pet. [28 U. S.] 6.

The second exception is, that notice of filing interrogatories, and the time and place of taking such depositions, was not given to Roane, Badgett, Taylor, and Fowler. The notice was served on Taylor, Roane, and Fowler, by delivering to each of them a true copy of the notice, and on Badgett and Fish, by leaving a true copy of the notice with a white member of the family, and on Dawson and Baylor by delivering a true copy to their counsel, they not being residents of this district. This, in my opinion, is a good service of the notice. By the 13th rule of practice for the courts of equity of the United States, the service of a subpoena may be made by leaving a copy thereof at the dwelling-house or usual place of abode of each defendant, with some free white person who is a member or resident in the family. If this be a sufficient service of a subpoena to notify the defendant of the suit, it ought to be con-

sidered sufficient service of a notice in any subsequent proceeding in the cause. This exception is also overruled. The third exception is in these words: "Only a part of the interrogatories of said complainant were propounded to and answered by, each of said witnesses." Not having arrived at any satisfactory conclusion upon this exception, in the absence of the presiding judge, a decision upon it will be deferred to the next term of this court. The fourth exception is, "that the deposition of Henry D. Mandeville, taken at Natchez, on the 8th of March, 1845, was taken without any sufficient notice having been served on said defendants, of the time and place of taking the same." The answer to this exception is, that where the deposition is taken according to the acts of congress, at a greater distance from the place of trial than one hundred miles, no notice is required. By the certificate of the magistrate before whom the deposition was taken, it appears that the witness lives more than one hundred miles from this place. That his certificate is competent evidence of the fact, is established by the adjudication of the supreme court, in the case of the Patapsco Ins. Co. v. Southgate, 9 Pet. [34 U. S.] 617. The court say: It was sufficiently shown, at least prima facie, that the witness lived at a greater distance than one hundred miles from the place of trial. This is a fact proper for the inquiry of the officer who took the deposition, and he has certified that such is the residence of the witness. In the case of Bell v. Morrison, 1 Pet. [26 U. S.] 356, it is decided that the certificate of the magistrate is good evidence of the facts therein stated, so as to entitle the deposition to be read to the jury. This exception is overruled.

The fifth exception is to the competency of the evidence contained in the deposition of Mandeville. The decision of this exception will be reserved to the final hearing.

The sixth exception is to the authority of the magistrate, before whom Mandeville's deposition was taken. It was taken before Thomas Fletcher, "judge of the probate court, within and for the county of Adams, and state of Mississippi"; and the inquiry is, whether he is authorized by the acts of congress to take depositions. By the thirtieth section of the judiciary act of 1789 [1 Stat. 80], depositions de bene esse may be taken before any judge of a county court of any of the United States. Is Thomas Fletcher a judge of a county court of any of the United States? In order to decide this question, we must look into the laws of the state of Mississippi. That this court is bound to take notice of the laws of Mississippi, is clearly settled by the supreme court of the United States, in the case of Owings v. Hull, 9 Pet. [34 U. S.] 625. The court there held that the laws of all the states in the Union are to be judicially taken notice of, in the same manner as the laws of the United States are to be taken notice of by the circuit courts of the

United States. Looking, then, into the laws of Mississippi, we find a court of probate established in each county of the state, with jurisdiction in all matters testamentary, and of administration, and of orphans' business; in the allotment of dower, in cases of idiocy and lunacy, and of persons non compos mentis; see section eighteen of the fourth article of the constitution, and the acts of the legislature of 1833, law 444. By the fourth section of the act it is provided, that the court of probate in each county shall provide a seal for said court, thereby constituting it a court of record. The question then is, Is this a county court? It is a court of record established in each county in the state, and styled "the probate court of the county of ———." I am clearly of opinion that it is such a county court as is contemplated by the act of congress, and that depositions may be taken before the judge thereof. The deposition of Mandeville is a deposition taken de bene esse, and may be read on the final hearing, unless the defendant shall show that the witness has removed within the reach of a subpoena after the deposition was taken, and that fact was known to the party, according to the decision of the supreme court in the case of the Patapsco Ins. Co. v. Southgate, 5 Pet. [30 U. S.] 617; Russell v. Ashley [Case No. 12,150]. This exception is therefore overruled.

On the 3d day of June, 1847, the following opinion was given on the exceptions to depositions previously filed:

JOHNSON, District Judge. At the last term the defendant's second exception to the plaintiff's depositions was overruled. The attention of the court is again called to that exception, as not having been fully considered. The notice of the time and place of taking the depositions, is insisted to be insufficient. I am, however, of opinion that no notice was necessary. It was an ex parte commission, in which the defendants, after being duly notified, failed to join, by filing cross interrogatories. In taking depositions under a commission, notice of the time and place of executing the commission is requisite, where the commission is a joint one. But when it is not joint, but ex parte, notice is not required. See 1 Smith, Ch. Prac. 364; 1 Newl. Ch. Prac. 262.

Upon the defendant's third exception, no opinion was expressed at the last term. It is as follows: "Only a part of the interrogatories of said complainant were propounded to, and answered by each of said witnesses, &c., they should be therefore suppressed." I am now satisfied that this exception is not well taken. The commission for taking these depositions, is not a joint, but an ex parte, commission in which the defendants failed to join; and it is only in cases of a joint commission that it becomes necessary that all the interrogatories should be propounded. Where the commission is ex parte,

the party refusing or failing to join it, would not be permitted to put any interrogatory to the witness, although he might be present at the examination. In such a case it is not incumbent on the person taking the deposition to cause all his interrogatories to be propounded to the witness. He is at liberty to put as many or as few of them as he thinks proper, with the exception of the last interrogatory, which must be put. This is the settled practice in the high court of chancery in England. See Newl. Ch. Prac. 267. Exception overruled.

On the 23d of August, 1847, the cause came on for hearing, and the court delivered the following opinion:

JOHNSON, District Judge. This is a bill in chancery, filed by Merrill, for the foreclosure of a mortgage of sundry slaves, executed to him by the defendant, James L. Dawson; and from the bill, answers, and evidence in the cause, the material facts appear to be as follows: That on the 11th of April, 1837, one N. L. Williams made his promissory note to the defendant Dawson, for the sum of $11,428.22, payable two years after date, and negotiable at the Planters' Bank of Mississippi at Natchez; and on the 1st June, 1837, said Williams executed to said Dawson a like promissory note for the sum of $1,150, payable twelve months after date; and said Dawson, being desirous of raising money on said notes, obtained from the complainant his indorsement upon said notes, as additional security thereto, and to secure and indemnify him against his liability thus assumed, as the surety of Dawson; the said Dawson, on the 25th of November, 1837, executed to said Merrill a mortgage upon sundry slaves therein named and described, the condition of which said mortgage was, that "if the said Dawson shall pay to said Merrill the sum of $12,578.22 (the amount of said two promissory notes), on the day the said notes shall become due, then the said indenture to be void." That on the 29th day of December, 1837, the said mortgage was recorded in the recorder's office in Jefferson county in this state, without acknowledgment or proof of its execution, except before a judge of the state of Mississippi. That the slaves named and described by the said mortgage were in the said county of Jefferson, on the plantation of Dawson, where he resided; and so remained in his possession until the 11th day of October, 1841, when all of them, except those claimed by the defendant, Sophia M. Baylor, were sold by the sheriff of Jefferson county, upon judgments and executions against the said Dawson; at which sale the defendants purchased, and received possession of a part thereof. That on the 28th day of November, 1837, the said Dawson presented said notes to said Planters' Bank, and by the discount thereof obtained the money to become due by said notes; that

when the said notes became due and payable, neither the said Dawson nor the said Williams ever paid any part thereof, but suffered them to remain wholly unpaid until the 4th day of March, 1842, when the complainant, as the indorser thereof, paid the full amount of principal and interest due by said notes. Dawson, in his answer, admits all the material allegations in the complainant's bill. The defendant, Sophia M. Baylor, claims the following slaves, embraced in the mortgage, namely, Dick, Beverly, Lucas, Porter, and William, as her own property at the time the mortgage was executed by Dawson, who admits, in his answer, that he had only conditionally bought them of her, which condition he was unable to perform, so as to get a title to said slaves. From an examination of the evidence in the cause, I am satisfied that these five slaves were the property of Mrs. Sophia M. Baylor, and that Dawson had no right to mortgage or otherwise dispose of them. The bill, therefore, as to the defendant Baylor, will be dismissed. The remaining defendants allege, in their answers, the mortgage set up by Merrill, the complainant, is as to them fraudulent and void, not having been made upon a good and valuable consideration, and bona fide, but with the intent to defraud the creditors and purchasers of Dawson; that it never was legally recorded; that the possession of the slaves did not accompany and follow the mortgage, but remained and continued with Dawson, the mortgagor, after the mortgage is alleged to have been made, and never were in the possession of Merrill, and is therefore fraudulent and void.

The exceptions to the mortgage I will proceed to consider; and, first, as to the registry or recording of the mortgage. Previous to the enactment of the Revised Statutes of this state, which took effect and went into operation by the governor's proclamation of the 19th March, 1839, there existed no law or statute requiring mortgages of personal property, made on consideration deemed good or valuable in law, to be recorded. The statute concerning conveyances (Steel & M. Dig. 131) relates solely to deeds, conveyances, bonds, and other obligations for lands, tenements, and hereditaments, and contains no provision whatever relating to deeds, conveyances, or mortgages of personal property. The Statute of Frauds (Id. 267) contains the following provisions: "And moreover, if any conveyance be of goods, chattels, and be not on consideration deemed good or valuable in law, it shall be taken to be fraudulent within this act, unless the same be by will duly proved and recorded, or by deed in writing acknowledged or proved by the witnesses in the office of the clerk of the superior court of this territory, the clerks of the circuit courts, or before any justice of the peace or other competent authority within the county wherein one of the parties lives, within three months after the

execution thereof, or unless possession shall really and bona fide accompany the gift or conveyance; and in like manner, where any goods or chattels shall have been pretended to have been loaned to any person with whom, or, claiming under him, in whose possession (they) shall have remained for the space of five years without demand made and pursued by due process of law, on the part of the pretended lender; or where any reservation or limitation shall be pretended to have been made of any use of property, by way of condition, reversion, remainder, or otherwise, in goods and chattels, the possession whereof shall have remained in another, as aforesaid, the same shall be taken as to creditors and purchasers of the persons aforesaid, so remaining in possession, to be fraudulent within this act, and that the absolute property is with the possession, unless such loan, reservation, or limitation, or use of property were declared by will or deed in writing, proved and recorded as aforesaid, and even then the creditors or purchasers may show actual fraud; and on such fraud being established, every such gift, contract, sale, loan, or possession shall be set aside in favor of such creditors or purchasers; and the provisions of this section shall also be extended to subsequent creditors after such pretended gift, sale, contract, loan, or conveyance." The second section of this act expressly provides, that "this act shall not extend to any estate or interest in any lands, tenements, or hereditaments, goods or chattels, which shall be upon good or valuable consideration, and bonâ fide and lawfully conveyed as aforesaid, nor to any person or persons who may be subsequent purchasers for bonâ fide considerations without notice." It is manifest, then, that the Statute of Frauds (which is only declarations of the common law), does not extend to the mortgage in this case, nor embrace it in any of its provisions, provided it was made upon a valuable consideration and bonâ fide; and if it were not, then it is inoperative and void, independent of the statute. But although mortgagees of personal property were not required to have their mortgages recorded, yet they were allowed and permitted to have them recorded if they deemed it expedient. This I infer from the following provisions, under the heads in the above digest of "Recorder" and "Mortgages." The first section under the head "Recorder" provides that there shall be an office of recorder in each and every district or county, which shall be called and styled "the recorder's office;" and the recorder shall duly attend the service of the same, and provide well bound books, wherein he shall record all deeds and conveyances which shall be brought to him for that purpose, according to the true intent and meaning of this act. The first section under the head of "Mortgages" provides, that every mortgagee of any real or personal estate in this

district (territory), having received full satisfaction and payment of all sum or sums of money as are really due him by such mortgage, shall, at the request of the mortgagor, enter satisfaction upon the margin of the record of such mortgage recorded in the said recorder's office, which shall for ever after discharge, defeat, and release the same. From these provisions, it can hardly admit of doubt, that mortgagees were entitled to have their mortgages recorded in the recorder's office; for unless they were recorded, how is it possible that the entry of satisfaction could be made upon the margin of the record of such mortgage? The statutes are silent as to the acknowledgment or proof of the execution of the mortgage before it shall be admitted to record, but expressly requires the recorder to record all deeds and conveyances which shall be brought to him for that purpose; neither do the statutes declare that the registry of a deed or mortgage of personal estate shall operate as notice to creditors or purchasers; and in the absence of such a provision, I do not feel warranted in giving to it such a construction. The mortgage, then, in the present case, was properly admitted to record in the recorder's office, in Jefferson county, without requiring acknowledgment or proof of its execution. The acknowledgment before the judge in Mississippi being unauthorized by law, is to be considered as null and void. It stands, then, as a mortgage legally recorded, notwithstanding the registry thereof does not operate as constructive notice to creditors and purchasers.

The next inquiry is, Whether the defendants had notice of the mortgage before they became purchasers? They claim to be bona fide purchasers at the sheriff's sale, without notice of the complainant's mortgage or lien upon the property. Notice of a lien or incumbrance upon property binds the purchaser, if received by him at any time before the execution of the conveyance and payment of the purchase-money, and arrests all further proceedings towards the completion of the purchase; and if persisted in, is held to be done in fraud of the equitable incumbrance. 2 Pow. Mortg. 619; Frost v. Beekman, 1 Johns. Ch. 301. In the case of Wormly v. Wormly, 8 Wheat. [21 U. S.] 449, it was said by Judge Story to be a settled rule in equity, that a purchaser without notice, to be entitled to protection, must not only be so at the time of the contract or conveyance, but at the time of the payment of the purchase-money; and in Jewett v. Palmer, 7 Johns. Ch. 68, Chancellor Kent said: "A plea of purchase for a valuable consideration without notice, must be with the money actually paid; or else, according to Lord Hardwicke, you are not hurt." The averment must not only be that the purchaser had not notice at or before the time of the execution of the deeds, but that the purchase-money was paid before notice. There must not only be a denial of notice before the

purchase, but a denial of notice before payment of the money. Even if the purchase-money be secured to be paid, yet if it be not in fact paid before notice, the plea of a purchaser for valuable consideration will be overruled. Hardingham v. Nicholls, 3 Atk. 304. There is not in the answers of the defendants, or either of them, any denial or any thing equivalent to it, that the purchase-money was actually paid before they had notice of the mortgage. This averment is essential, and cannot be supplied by intendment in order to make the plea available. The defendants, then, have not placed themselves in the attitude to call for proof on the part of the complainant, that they really and in fact had notice. But admitting their denial of notice to be full and complete, the evidence in the cause conclusively establishes the fact that they and each of them had actual notice of the mortgage before they made the purchase. The defendants Roane and Taylor admit that they saw the record of the mortgage in the recorder's office, before they purchased, but believed it to be fraudulent and made merely for effect. The defendant Fish says, in his answer, "this respondent thinks there was no general notoriety on the subject of this mortgage, as he never heard it spoken of but once before he purchased one of said negroes, and then it was said to be fraudulent by the persons speaking of it."

These admissions are amply sufficient to charge these defendants with notice of the mortgage. But by adverting to the depositions taken in this case, it will be seen that actual notice of the mortgage is conclusively proved against each of the defendants before the sale was made by the sheriff. Martin W. Dorris, in his deposition, says, "I believe that F. W. Trapnall proclaimed the existence of said complainant's incumbrance, and forbid the sale; and that Samuel C. Roane, Samuel Taylor, N. H. Fish, and Col. Fowler, were present in hearing of such proclamation; and that he heard Samuel Taylor say since the said sale that he was aware of the existence of said mortgage." Robert W. Walker in his deposition, says, "I know that said record book B. was lying open at page 174, in the clerk's office of said county, on the morning of said sale, subject to inspection, and that Absalom Fowler, in person, examined said record book, and inspected said deed of mortgage. I believe that it was generally known and spoken of at the sale by those present, that the complainant Merrill had a mortgage on the negroes." Drew White says, that he, as deputy sheriff, sold the negroes in contest, and that when said sale was about to commence, he proclaimed, in the presence and hearing of said Roane, Taylor, Fowler, and Fish, that said negroes would be sold subject to all incumbrances, without reference to any particular incumbrance. He further states, that F. W. Trapnall did forbid the sale of said negroes on behalf, he thought, of William Dawson. Ignace Bogy states, that "at the time said slaves of Dawson were sold by the sheriff of Jefferson county, I heard F. W. Trapnall, Esq., in an audible voice, forbid the sale of them, at the time when they were offered for sale, at the instance of some person whose name I do not now recollect; and said defendants, Roane, Taylor, Fish, Badgett, and Fowler, were present at the time, but as I did not have their ears, I cannot say that they also heard him." John J. Hammett, sheriff of Jefferson county, who made the sale, states, "that it was generally understood and spoken of by those present at said sale of said negroes, that said complainant Merrill had a mortgage upon them. I believe said Trapnall did, on behalf of one William Dawson, forbid publicly, the sale of said negroes. I believe that said defendants were all present at that time; and that when about to commence the sale of said negroes, I, as sheriff as aforesaid, proclaimed publicly and audibly, in the hearing of all present, and notified all persons that I offered said negroes for sale subject to all incumbrances, and that I would convey to the purchasers of said negroes the interest and title of said Dawson only; and that there were some three or four mortgages recorded in the clerk's office upon said negroes, to which mortgages I referred all persons present, and requested them to go into the clerk's office and examine for themselves before purchasing; and I believe that said defendants Roane, Taylor, Fowler, Fish, and Badgett were all present and heard such proclamation." Frederick W. Trapnall states: "I was present at the sale of the negroes of J. L. Dawson, at the October term of the circuit court of Jefferson county, in 1841, and at the request of Dawson at the time the sale was about to take place, I proclaimed in a loud voice that the negroes then offered for sale by the sheriff were embraced in a deed of mortgage, made by him to A. P. Merrill, which was then of record in Jefferson county, which was then unsatisfied, and I therefore forbid the sale. My impression is, that Absalom Fowler, Samuel C. Roane, Samuel Taylor, Nathaniel H. Fish, and Noah H. Badgett, defendants in this suit, were present on that occasion, and were within hearing of my voice. Badgett was standing by me at the time, and heard my proclamation; a good deal of conversation took place upon the subject. The sheriff then proclaimed that the negroes had been appraised, and would be sold subject to it."

The evidence just recited is, in my judgment, amply sufficient to charge the defendants with actual notice of the mortgage under which the complainant claims; the proof is too clear, direct, and positive, to admit of any reasonable doubt.

The remaining inquiry is, Whether the mortgage in this case was made upon a good and valuable consideration, and bona fide, or with the design and intention of defrauding the creditors and purchasers of Dawson. The main ground relied upon by the defendants'

counsel is, that the possession of the slaves did not accompany and follow the mortgage, but was retained by the mortgagor, and this circumstance is insisted to be conclusive and untraversable evidence of fraud; but that, if not conclusive evidence, at least a strong badge of fraud, sufficient, in this case, to render the mortgage inoperative and void against the defendants. A bill of sale absolute upon its face, made by a person who still continues in possession of the property, has been held both in England and in this country, by the highest tribunals, to be, per se, fraudulent as to the creditors and subsequent purchasers of the person so retaining possession. This doctrine received the sanction of the supreme court of the United States in the case of Hamilton v. Russell, 1 Cranch [5 U. S.] 309. The fact of possession not accompanying such a bill of sale, is considered conclusive evidence of a fraudulent intent, and as to creditors and purchasers the bill of sale is, in a judgment of law, fraudulent and void; but the continuance of possession by a mortgagor is not considered as having the same conclusive and vitiating effect upon the mortgage. There is an essential difference between the effect of a possession retained by the maker of an absolute bill of sale, and the possession retained by the maker of a mortgage. The object of the one is to pass the absolute right of property, and the object of the other is to give a security defeasible upon a particular contingency; the possession in the former case is utterly incompatible with the deed; whereas, in the latter case, there exists no such incompatibility. Whilst, therefore, the possession in the former case may be correctly said to form the conclusive and untraversable evidence of fraudulent intent, and under the deed, per se, fraudulent, such cannot be admitted to be the effect of the possession in the latter case. Possession by the mortgagor before forfeiture cannot be construed to be fraudulent, because it is consistent with the title, that not vesting until forfeiture. Nor can the continuation of the possession, after a breach of the condition, of itself, unconnected with any other circumstance of lapse of time, or the conduct of the mortgagee, be considered as a strong badge of fraud. The deed is still a mortgage; the right of the mortgagee is still contingent and collateral, and the possession of the mortgagor is not necessarily inconsistent with the title.

The utmost extent to which the authority of the decision can be carried, is that the tribunal, whose province it is to decide the facts, may infer a fraudulent intent, from the fact of possession remaining in the mortgagor. But this inference may be dispelled by the proof of other facts showing the transaction to be fair and bonâ fide. McGowan v. Hoy, 5 Litt. (Ky.) 240, and the authorities there cited; Head v. Ward, 1 J. J. Marsh. 280. See the case of U. S. v. Hooe, 3 Cranch [7 U. S.] 73; also, Wheeler v. Sumner [Case No. 17,501]; D'Wolf v. Harris, [Id. 4,221]; Maples v. Maples, Rice, Eq. 300; Fishburne v. Kunhardt, 2 Speer, 564; Gist v. Pressley, 2 Hill, Eq. 318; 2 N. H. 15, 547; Smith v. Acker, 23 Wend. 653.

Are there any other marks or badges of fraud in the present case? From all the facts and circumstances connected with the mortgage, independent of the declaration of Dawson after he made the mortgage (and they are clearly incompetent evidence), I have seen nothing from which an inference of fraud and collusion can be deduced. The execution of the mortgage by Dawson, and his indorsement of the two promissory notes, is established by Dorris and Hammett, who prove his handwriting; and the indorsement of the notes by Merrill, is proved by the cashier and teller of the Planters' Bank. The discount of the notes, and the payment of the money to Dawson by the Planters' Bank, and the payment to the bank of the notes by Merrill, on the 4th March, 1842, is established by the testimony of the same witnesses. The mortgage itself was actually recorded in the recorder's office in Jefferson county, on the 29th December, 1837. These facts clearly prove that the mortgage was made upon a good and valuable consideration, and bonâ fide, and not with the design or intent to defraud creditors and purchasers. Where this appears from the evidence in the cause, the inference of fraud, if any, arising from the mortgagor's possession is dispelled, and not calculated to cast a shade upon the mortgage. The defendants in their answers aver, that from the declaration of Dawson stating that the mortgage was merely nominal, and made only for effect to shield his property, they regarded the mortgage as fraudulent and void. No principle of the law of evidence is better settled than that the declarations of the grantor impeaching a deed he has made, are incompetent, and cannot be received for that purpose.

The conclusion to which I have arrived from a consideration of all the circumstances of the case is, that the mortgage was made upon a valuable consideration and bonâ fide, is free from the taint of fraud and collusion, and that the complainant is entitled to the relief he seeks.

The inquiry here arises as to the decree which ought now to be made. In the case of Downing v. Palmateer, 1 T. B. Mon. 66, the court of appeals of Kentucky states the practice in the following terms: "The practice of the courts of equity on this subject is simple, and ought not to be departed from. Whatsoever controversies may arise about the validity of a mortgage, its forfeiture and its payment. in whole or in part, is decided upon at its first hearing, and the courts ascertain what is due, and by interlocutory decree declare that unless this sum is paid, or tendered by a particular time, the mortgage shall be foreclosed, and a sale decreed, if a sale is proper to be had. The time so given

ought to expire in term time, and is sometimes, under extraordinary circumstances, lengthened by the chancellor. If, when that time expires, payment is moved with such costs as the chancellor shall adjudge, the mortgage is released, and there is an end to the controversy. "If a tender and refusal is relied on, the money is brought into court, with such costs as shall be allowed, and the party is thus permitted to redeem. If, on the contrary, neither payment nor tender is relied on (in all of which matters the court ought to adjudge), the court may decree an absolute foreclosure in many cases without sale; but if a sale is prayed for, and deemed expedient, the chancellor decrees it accordingly, and appoints his commissioners to execute it."

The principle and practice above laid down I deem to be correct, and they will be acted upon in the present case.

Decree: This cause came on to be heard at this term, and was argued by counsel, and thereupon, upon consideration thereof, it was ordered, adjudged, and decreed as follows, namely: That the bill as to the defendant, Sophia M. Baylor, be, and the same is hereby dismissed with her costs to be paid by her (to) the said complainant. And it is further ordered and decreed, that unless the sum of eighteen thousand nine hundred and thirty-four dollars shall be paid or tendered to the said complainant, or his solicitor, by the remaining defendants, or any or either of them, on or before the first day of next term of this court, they, the said defendants, are from thenceforth to stand absolutely debarred and foreclosed of and from all right, title, interest, and equity of redemption of, in, and to the said mortgaged property in the bill mentioned, and a sale of said mortgaged property decreed, if a sale thereof shall be deemed expedient by this court. And the question of hire of the mortgaged property, of costs, and all other questions in the cause not now decided, are reserved to the further decree of this court.

William Dawson, James Smith, and Garland Hardwick, having disclaimed, the bill was dismissed as to them.

On the 15th of May, 1848, the cause came on for further and final hearing, and THE COURT pronounced the following final decree:

This day come the parties by their respective solicitors, and this cause coming on for a further and final decree in the premises, it doth satisfactorily appear to the court here, from the pleadings and proofs herein, that the indenture of mortgage mentioned in the bill was made in good faith, for a good and valuable consideration, on the 25th of November, 1837, by the said James L. Dawson, one of said defendants, to and with the said Ayres P. Merrill, the complainant, for the purpose of securing the payment by the said Dawson of the two promissory notes particularly mentioned in the said mortgage and bill of complaint, namely, one for eleven thousand four hundred and twenty-eight dollars and twenty-two cents, dated 1st of April, 1837, and due two years after the date thereof; the other for eleven hundred and fifty dollars, dated 1st of June, 1837, due twelve months after the date thereof, drawn by N. L. Williams, and payable to the order of the said James L. Dawson at the Planters' Bank of Mississippi at Natchez, and indorsed by said James L. Dawson, and also by the said Ayres P. Merrill, as security for said Dawson, to enable the said Dawson to obtain the discount thereof at the said Planters' Bank, as alleged in the bill; and which said mortgage was also made, and intended to be made, to indemnify and save the said Merrill harmless in regard to his indorsement of said notes. That on the 28th of November, 1837, said bank discounted said notes for the sole and exclusive use and benefit of him, the said Dawson, and placed the proceeds to his credit on the books of the bank, and subsequent to that time paid said proceeds to him or order, and that said bank thus became the bona fide holder of said notes for a valuable consideration; that when said notes respectively became due and payable, the said N. L. Williams, as well as the said Dawson, wholly failed to pay the same to said Planters' Bank, nor did any other person pay the same for them, nor any part thereof; and therefore the notes were duly protested for non-payment. And on the 4th day of March, in the year 1842, the said Ayres P. Merrill, by reason of the premises and as last indorser, was obliged to pay and did pay the sums of money in said promissory notes specified, together with interests, costs, &c., up to that time, amounting in the aggregate to fifteen thousand five hundred and ninety-three dollars and sixty-one cents, to the said Planters' Bank of Mississippi at Natchez, and then took up the same, and became, and from thenceforward continued to be, the legal holder and owner of said notes; and that being such legal holder and owner thereof, by virtue of the payment aforesaid, he did, on the 7th day of September, 1842, commence this his suit, to avail himself of the provisions of said mortgage, and to foreclose the same. That at the making of said indenture of mortgage, the said James L. Dawson was possessed, as of his own absolute property, of certain negro slaves specified in said mortgage and bill of complaint, and then upon his plantation in the county of Jefferson and state of Arkansas, of the names and then of the ages respectively next mentioned, namely, negro man named Jim, sometimes called "Old Jim," forty years old; Governor, twenty-two years old; Sandy, twenty-one years old; Connell, twenty years old; Tom, nineteen years old; negro woman named Phoebe, seventeen years old; Catharine, eighteen years old; Maria, sixteen years old; Mary, fifteen years old, and Eliza, eighteen years old; negro boy named Ransom, twelve years old, and Jim, sometimes called "Young Jim,"

eleven years old; all of whom were likely and valuable slaves, and continued in the possession of the said James L. Dawson until the 11th of October, 1841, and were and are hereby declared subject to the mortgage debt mentioned in the pleadings. That a male infant child of said Phoebe, named Jackson; that another male infant child of said Phoebe, named Beverly; that an infant boy of said Mary, named Henry; and that an infant girl of said Maria, named Frances, born since the making of said mortgage, as well as such other of the issue of such mortgaged slaves, not herein specially named, as may have been born since the making of said mortgage, ought to be, and hereby are declared to be, subject to the operation of said mortgage, and are to be sold towards discharging the said mortgage debt. That on the 11th of October, 1841, the said negro slaves, men, women, and children (excepting Beverly, born since), having been first valued according to law by three appraisers, sworn for that purpose, were sold as the property of said James L. Dawson, under execution, at the court house door of Jefferson county, and which sale, if valid at all, was, in the opinion of the court, subject to said mortgage and to the rights of said Merrill, under and by virtue of the same; and that on that occasion the said Samuel Taylor purchased and obtained possession of Old Jim, Catharine, and Ransom; that at the same time Samuel C. Roane purchased and obtained possession of Sandy, Connell, and Young Jim; that at the same time the defendant Fish purchased and obtained possession of Governor; that at the same time the defendant, Absalom Fowler, purchased and obtained possession of Tom, Mary and her infant boy named Henry, Maria and her infant girl named Frances, Phoebe and her infant boy named Jackson, and said negro woman named Eliza. That about a week after said sale, the defendant, Noah H. Badgett, purchased of said Fowler the said negro woman Phoebe and her infant boy named Jackson, and also the said negro woman Eliza; and that said Phoebe, since her acquisition by the said Badgett, has given birth to a male infant boy named Beverly. That if any notice was necessary, the said defendants respectively, as it satisfactorily appears to the court from the pleadings, circumstances, and proofs herein, had sufficient actual notice of the existence of said mortgage, before and at said sale, to render their purchases respectively subject to it.

That upon the proof in this cause, the court is of opinion, and doth find the said negro slaves respectively to be of the following value, namely, Old Jim, five hundred dollars; Governor, eight hundred and fifty dollars; Sandy, eight hundred dollars; Connell, eight hundred dollars; Tom, eight hundred dollars; Phoebe and her said child Jackson, one thousand dollars; Beverly, another child of said Phoebe, fifty dollars; Catharine, eight hundred dollars; Mary and her said child Henry, seven hundred and fifty dollars; Maria and her said child Frances, nine hundred dollars; Eliza, seven hundred dollars; Ransom, eight hundred dollars; Young Jim, six hundred dollars. That subpoenas in this case were served on the said Fowler on the 10th, on said Badgett on the 12th, on said Roane on the 14th, on said Taylor on the 14th, and on the said Fish on the 15th day of September, 1842; and the court here being well satisfied that said negro slaves are insufficient to discharge said mortgage debt, and that the hire thereof, according to the rate as proved by the depositions in this cause, ought to be applied towards the extinguishment of said interest and principal, such hire to be estimated from the time of the service of the subpoena on said defendants respectively, up to this time.

That from the proofs in the cause, the court is of opinion, and doth find the value of the hire of the following negro slaves in the possession of Absalom Fowler: for Mary, seventy dollars; for Tom, one hundred dollars; for Maria, seventy dollars per annum; and for which the said Fowler is declared accountable, at the rates aforesaid, to be computed against him from the 10th day of September, 1842, when the subpoena was served upon him, and which makes an aggregate amount of thirteen hundred and fifty-eight dollars, and for which said amount decree ought to be rendered in favor of the complainant. That the court is also of opinion, and doth find the value of the hire of Phoebe, in the possession of the said Noah H. Badgett, to be seventy dollars per annum, which being computed from the 12th day of September, 1842, the time when the subpoena was served upon him, amounts to three hundred and ninety-six dollars, which is chargeable against said Badgett, and for which a decree ought to be rendered in favor of the complainant. That S. H. Hempstead, Esq., the solicitor of the said complainant, produced and read in open court a certain memorandum or agreement in writing, executed in duplicate by and between the said Ayres P. Merrill, acting in that behalf through S. H. Hempstead, his attorney in fact, of the one part, and Samuel Taylor and Nathaniel H. Fish, two of said defendants, of the other, dated the 10th day of December, 1847; and also a certain other memorandum or agreement in writing, also executed in duplicate, by and between the said Ayres P. Merrill, acting in that behalf through S. H. Hempstead, his attorney in fact, of the one part, and Samuel C. Roane, one of said defendants, of the other, dated the 22d day of April, 1848; whereby it manifestly appears that the said Samuel Taylor, Nathaniel H. Fish, and Samuel C. Roane, acknowledging the right of said complainant to subject the said slaves so purchased by them respectively to the said mortgage, and to recover reasonable hire therefor, and also with a view to end any further litigation, as far as they are concerned, adjusted and compromised with said complainant, and in such adjustment, said Samuel Taylor, not delivering

the said slaves purchased by him, accounts for the same as follows: Old Jim at five hundred dollars, Ransom at eight hundred dollars, and Catharine at eight hundred dollars, amounting in the aggregate to twenty-one hundred dollars, and which is the appraised as well as the real value thereof, and for the hire thereof nine hundred dollars; making an aggregate of three thousand dollars. That said Nathaniel H. Fish, not surrendering Governor, accounts for him at eight hundred and fifty dollars, the appraised as well as the real value of him, and for his hire three hundred dollars, making together eleven hundred and fifty dollars. That said Samuel C. Roane, not delivering Sandy, accounts for him at eight hundred dollars, the appraised as well as the full value, and for the hire of the slaves purchased by him as aforesaid six hundred dollars, making together fourteen hundred dollars; that he elects to surrender to the complainant Connell, who is to be received at eight hundred dollars, the appraised as well as the full value thereof, and Young Jim at six hundred dollars, the appraised as well as the full value thereof, making for the two fourteen hundred dollars; and which two last-mentioned slaves are hereby decreed to the complainant, by consent of parties and to carry out said agreement, making altogether the sum of six thousand and nine hundred and forty-nine dollars, to be applied towards the extinguishment of said mortgage; and with which the said James L. Dawson is to be credited on said mortgage debt, as of the day of the rendition of this decree. The court here being satisfied, that by said compromise the said defendant Dawson obtains as large if not a larger credit on said mortgage debt than if said negroes were sold; and there is nothing in controversy, as far as said Taylor, Fish, and Roane are concerned, except costs. That the court here from the pleading and proofs in the cause, is of opinion, and doth find the indebtedness of the said defendant Dawson, up to this time, upon said mortgage, to be twenty-one thousand and three hundred and twenty-eight dollars for principal and interest, and deducting therefrom the said credit of six thousand and nine hundred and forty-nine dollars, that the balance justly (due) and owing by the said defendant Dawson to the said Ayres P. Merrill, and in arrear at this time upon said mortgage, and secured thereby, is fourteen thousand three hundred and sixty-nine dollars ($14,369).

It is therefore ordered and adjudged and decreed, that the said James L. Dawson do pay to the said Ayres P. Merrill the said balance of fourteen thousand three hundred and sixty-nine dollars, which includes principal and interest, and is the sum now justly due upon said mortgage, after allowing the credit aforesaid. That the said James L. Dawson, Absalom Fowler, and Noah H. Badgett be, and they are hereby absolutely barred and foreclosed from all equity of redemption in and to all or any of the slaves specified in the said

mortgage, or to the issue thereof born since the making of said mortgage; and it is further ordered, adjudged, and decreed, that Samuel A. White be, and he is hereby, appointed a commissioner in this case, and to whom the said Absalom Fowler and Noah H. Badgett, without any unnecessary delay, and upon request being made by him, are required to surrender and deliver said slaves so purchased and possessed by them respectively as aforesaid; that is to say, that the said Absalom Fowler be, and he is hereby, required to surrender to such commissioner said slaves, Tom, Mary, and her child Henry, and Maria and her child Frances, aforesaid, and the issue thereof, if any, by whatever name known or distinguished, and born since he acquired them; and that said Noah H. Badgett also be, and he is hereby required to surrender to such commissioner said slaves Eliza and Phoebe, and her two children named Jackson and Beverly, and such other of her issue, if any, by whatever names known, born since he acquired her; and the said commissioner may, if it is necessary, sue out a writ of assistance to obtain the possession of said slaves, or any of them. And it is further ordered, adjudged, and decreed, that in case the said Absalom Fowler and Noah H. Badgett, or either of them, should be unable to deliver, or should fail or refuse to deliver, the slaves so purchased by them as aforesaid, upon the request of said commissioner, then and in that event it is further ordered, adjudged, and decreed, that for Tom, Mary and her child Henry, and Maria and her child Frances, or any one of them which the said Absalom Fowler is unable, or should fail or refuse to deliver, he shall be held accountable and liable, and shall pay to the said complainant, Ayres P. Merrill, the value thereof, as fixed and ascertained in a previous part of this decree, and to which reference is now made for the value thereof respectively, and for the collection thereof a special execution may issue, as at law; and for said negro Eliza and negro woman Phoebe and her said children, Jackson and Beverly, or any of them which the said Noah H. Badgett is either unable or should fail or refuse to deliver up to such commissioner, he shall in like manner be held accountable and liable to said complainant, Ayres P. Merrill, for the value thereof respectively, as fixed and ascertained in a previous part of this decree, and to which reference is now made respectively, and for the collection of which a special execution may issue, as at law; but before any such execution can be taken out in either case, the said commissioner must file in the office of the clerk of this court an affidavit stating such inability, failure, or refusal to deliver on request, and then said execution may issue against the proper persons upon the application of the complainant or his solicitor, and which shall be executed by the marshal as executions in ordinary cases; and whatever moneys may be made thereon shall be applied towards the extinguishment of the balance of

said mortgage debt; and it is further ordered, adjudged, and decreed, that if the said commissioner shall obtain the possession of all or any of said slaves, or the issue thereof aforesaid, either by voluntary delivery to him, or by his own exertions, or by a writ of assistance, he shall sell the same at the front steps of the state house in the city of Little Rock, at public auction, for cash in hand, on some convenient day to be fixed by him, first giving at least thirty days' notice of the time and place of sale, by publication in the "Arkansas Banner," and advertisements posted up at three public places in the city of Little Rock; and that said commissioner be, and he is hereby empowered to make proper bills of sale to the purchaser or purchasers, and that, after paying the expenses of sale, he pay to the said complainant or his solicitor the proceeds of such sale, and which proceeds must be applied towards the extinguishment of said mortgage debt; or if the complainant should purchase the negroes, or any part of them, at such sale, the amount bid by him must be allowed as a credit on said mortgage debt; and that a copy of this decree be furnished by the clerk to said commissioner, and that he make a full report of his proceedings to the next term of this court; and it is further ordered and decreed, that the said Absalom Fowler do pay to the said complainant the said sum of thirteen hundred and fifty-eight dollars, it being the hire of said slaves, Tom, Mary, and Maria, according to the rates and computed hire mentioned in the introductory part of this decree, and for which sum an execution may issue as at law, upon the application of the complainant or his solicitor, and the amount, when collected, is to be placed as a credit upon the said mortgage debt; and it is further ordered and decreed, that the said Noah H. Badgett do pay to the said complainant the said sum of three hundred and ninety-six dollars, being the hire of the said slave Phoebe, according to the rate and computed hire mentioned in the introductory part of this decree; for said sum execution may issue, as in the last-mentioned case, and the amount collected shall be placed in like manner upon said mortgage debt; and it is further ordered and decreed, that the costs of this suit be taxed by the clerk against the said defendants Taylor, Roane, Fowler, Fish, and Badgett, the proportion of one-fifth part thereof to each one of them, and that they respectively pay said costs in that proportion; but the costs of the defendants, James L. Dawson, Baylor, Smith, Hardwick, and William Dawson, are excepted out of the costs as above ordered to be paid. The costs occasioned by these defendants must be paid by the complainant. Whereupon the said defendants, Absalom Fowler and Noah H. Badgett, come and pray an appeal from a decree rendered herein to the next term of the supreme court of the United States; and thereupon, the court being fully advised in the premises, is of opinion that said prayer ought to be, and the same is hereby granted. And thereupon, it is further considered and ordered by the court, that, upon the said defendants Fowler and Badgett, or either one, giving security according to law for the prosecution of said appeal to effect, and to answer all damages and cost, if they fail to make their plea good in the said supreme court; that the appeal hereby granted is to operate as to both or either who may give the required security, against said complaint as a supersedeas.

Appeal bond was given by Fowler, a transcript taken, and the case removed into the supreme court [where the judgment below was affirmed. 11 How. (52 U. S.) 375].